Filed 12/18/15  P. v. Malone CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DESHAUN MALONE,<br><br>        Defendant and Appellant. | A140747<br><br>(Solano County<br>Super. Ct. No. FCR261283) |

A jury convicted appellant Deshaun Malone of second degree murder and found he had personally and intentionally discharged a firearm in the commission of the offense, causing death.  (Pen. Code, §§ 187, subd. (a), 12022.53, subd. (d).)[1]  He appeals from the judgment sentencing him to 40 years to life in prison, arguing (1) the evidence was insufficient to support a verdict of second degree murder, (2) the court erred by instructing the jury on second degree murder over a defense objection because it was not a lesser included offense of first degree felony murder as charged in the amended information, (3) the trial court should have dismissed the case or issued sanctions based on the prosecution's failure to preserve exculpatory evidence, (4) the case should have been dismissed on double jeopardy grounds because the prosecution intentionally induced a mistrial during a previous trial on the same charge, (5) the court should have granted a mistrial or new trial based on the prosecutor's examination of an accomplice

_____

[1]  Further references are to the Penal Code unless otherwise indicated.

1

who refused to answer, and (6) the alleged errors were cumulatively prejudicial. We affirm.

## FACTS AND PROCEDURAL HISTORY

This case is before us a second time. In a prior appeal, this court reversed appellant's conviction for first degree murder under a felony-murder theory because the trial court did not instruct the jury on voluntary manslaughter as a lesser offense. (*People v. Deshaun Parish Malone* (Nov. 28, 2011, A129450) [nonpub. opn.].) The first retrial following remand ended in a mistrial after the prosecutor referenced appellant's prior conviction for first degree murder. The trial court denied appellant's motion to dismiss the case on double jeopardy grounds, and a second retrial commenced at which the following evidence was adduced:

On November 2, 2008, 17-year-old Kendrick Lewis was spending time with his girlfriend, Karlee Swafford, at his parents' house in Vallejo. He and Swafford left the house a little before 5:00 p.m., after he received a phone call from someone who wanted to buy Ecstasy. Lewis drove his car, a 2007 Chevrolet Impala, and Swafford rode in the front passenger seat. On the way they picked up two friends, Willie Muir and Trung Nguyen, who sat in the backseat with Nguyen on the driver's side and Muir on the passenger's side. As they were driving, Lewis received a phone call directing him to Mockingbird Lane, a street in a residential neighborhood in Fairfield.

The group arrived on Mockingbird Lane at about 5:45 p.m., at which point Lewis parked in the street and left the car running. Jamal Kelly and appellant approached, and Lewis rolled down his window. Kelly stood near the driver's window and discussed the purchase of Ecstasy with Lewis, while appellant stood near the back door of the driver's side near Nguyen. Shortly into the transaction, appellant reached inside the car through the half-open back passenger window holding a gun. He fired a single shot that hit Lewis in the upper back, striking his right lung and spinal cord and deflecting off the collarbone. Lewis hit the car's accelerator and it crashed into a pole. Appellant and Kelly left the scene, and police arrived shortly after. Lewis died as a result of his wound.

2

Swafford, Nguyen and Muir all testified at trial. According to Swafford, Lewis showed Kelly two different colors of Ecstasy, one of which was retrieved from under the back passenger seat. Kelly wanted to hold the drugs but Lewis said no because he had not yet received the money. It was at that point that appellant, who was wearing a black hoodie, stuck the gun inside the car. He waved it around, saying, "Don't drive off, don't drive off." With his entire arm inside the car up to his shoulder, appellant pointed the gun at Lewis and shot him in the back. Lewis then hit the gas pedal and crashed into the pole, after which he said he couldn't feel his legs and lost consciousness. When the car came to a stop after the crash, Swafford got out and attended to Lewis until the police arrived. Muir and Nguyen were behind her in a grassy sidewalk area.

Swafford testified that she did not see anyone else in the car with a gun and did not hear either Nguyen or Muir say anything threatening to appellant, though she did hear appellant say something to Nguyen along the lines of "[w]hy is your partner looking at me funny?" Appellant also asked whether Nguyen "had a problem" or "what is wrong with your boy?" Swafford had previously told police that Nguyen responded by saying, "Nobody looking at you funny," and that before appellant put the gun inside the car, he told Muir, "I'll shoot you first." Swafford falsely told the police they had gone to the location to buy marijuana.

Muir testified that when they arrived at the agreed location for the drug deal, Lewis left the car running in the middle of the street. They were approached by Kelly and appellant, both of whom were wearing black hoodies. Kelly talked with Lewis about the Ecstasy and Lewis asked Muir to hand him another bag of Ecstasy from beneath the passenger seat. When Lewis had all the drugs in his lap, appellant pulled a gun from his pocket and pointed it in the car, saying something like "don't run or I'll shoot." The car began to move and appellant shot Lewis. After the car struck a pole, the three passengers got out and Muir saw a car coming. Fearing the occupants were appellant and Kelly, he ran and hid behind a car parked several houses away and returned to Lewis's crashed car after the other car passed.

Muir denied having a gun on the night of the shooting and testified that no gun except for appellant's was ever inside the car. He acknowledged telling police they had been trying to buy marijuana at the time of the shooting. He previously told police that appellant had said something like "why is your boy looking at me like that," referring to Nguyen. About two years after the shooting, Muir was arrested for possession of Ecstasy and possession of a gun and pleaded guilty to possessing the gun.

Nguyen testified that when they arrived on Mockingbird Lane, Lewis pulled up to the curb and Kelly and appellant approached the car. Nguyen rolled down the back passenger window as Lewis and Kelly negotiated the drug deal. Nguyen thought appellant seemed suspicious and asked him, "[W]here your hands at?" Appellant responded, "What is wrong with you[?] Go get your boy." Muir gave Lewis a second baggie of pills and Kelly asked appellant if they were the kind he wanted. Appellant drew a gun from his waistband and put it inside the back passenger window, pointed it at all the occupants, and said, "Give me everything." Appellant pointed the gun at Lewis and warned him not to drive off or he would shoot, and when Lewis started to drive away, appellant shot him. The car crashed and appellant and Kelly ran the other way. Nguyen got out of the car and sat on the curb crying as he called 911. He denied that anyone in the car had a gun. Nguyen believed the shot was fired at "point-blank" range, within two inches of Lewis's back from the area between the driver's seat and the window.

Officer Steven Trojanowski of the Fairfield Police Department was dispatched to the scene and arrived at about 5:50 p.m. Muir and Nguyen were about 10 feet away from the crashed car, frantically flagging him down, while Swafford stood outside the driver's door screaming for help. Lewis was unconscious with no vital signs, and Trojanowski saw a circular pattern of blood on his upper back and smeared blood on the driver's seat corresponding to that wound. The driver's side window was rolled down and the back window on the driver's side was mostly rolled down. Many pills were scattered throughout the car and a single bullet casing was found on the rear passenger side floorboard. No gun or backpack was recovered from the car. A "Jason" movie character

4

hockey mask, a gray glove and a small fabric bag were found on the grass nearby. According to Swafford, Nguyen and Muir, the mask had been in the backseat of the car but no one had been wearing it.

Rigoberto Estrada was changing the oil in his truck outside his home on Mockingbird Lane when Lewis was shot. He saw a parked car and two men standing outside it. Estrada heard a gunshot and the same two men ran by him laughing.

About a month after the shooting, appellant was interviewed by Detective Brett Morris after waiving his rights under *Miranda v. Arizona* (1966) 384 U.S. 436. During the interview, which lasted about four hours, appellant originally denied any involvement in the shooting. Although Morris had not told appellant exactly when the shooting occurred, appellant repeatedly said he had an alibi for November 2, 2008, at 5:30 p.m. Appellant claimed to have been helping a friend move to Grande Circle, which was near Mockingbird Lane, and he acknowledged being with Kelly that evening. Morris suggested the shooting might have been an accident or that maybe someone inside the car had a gun.

About halfway through the interview, appellant indicated he was with some friends on Grande Circle when he saw two men in black hoodie sweatshirts leave the neighborhood. They returned about 15 minutes later without their sweatshirts and told appellant they had just "put a nigga in a body bag." The men also referred to "jacking" (robbing) someone. Appellant said the killing was over drugs and the victim was just supposed to give up the pills, but they ended up shooting him. Morris told appellant he knew he was present at the shooting and appellant admitted as much, though at first he claimed Kelly had the gun and was the shooter.

Appellant eventually admitted to Morris that he was the one who had the gun. He and his "partner" had gone to Mockingbird Lane to purchase Ecstasy and met the dealer in his car. One of the passengers in the backseat had a "Jason" hockey mask on and a backpack in his lap, causing appellant concern. Appellant said he did not see another gun, but brought out his own gun with the intention of shooting the passenger with the

5

mask in the arm. As he was preparing to shoot the passenger, the car moved forward and the car door post hit his arm, causing him to pull the trigger.

Appellant wrote a letter of apology to Lewis's family: "Dear [L]ewis family I'm very sorry about what happen[ed] to your son I wish things could have went better me and my friend was tryin to buy some pills to have a good time but things went wrong he pull up with three other people one was a masked gunman he didn't won't [*sic*] to take off his mask and I saw he reachin for a gun so I drew my firearm to try to make him put his down but he kept reachin so I tryed to shoot him in the arm to make him drop it but your son had started to drive off as I squeezed [the] trigger my arm hit the door post and I accidentally shoot your son in his back I had no intention on shooting or killing your sorry [*sic*] I'm very sorry and I wish I could take back what I did."

Kenton Wong was called as a defense expert in ballistics and crime scene investigation and testified that the available evidence was consistent with appellant's version of events. Although there was no bullet hole in the back of the driver's seat, the shot could have gone over the seat if it was somewhat reclined. Wong believed the police were negligent in failing to test any of the passengers' hands for gunshot residue and further noted the police did not conduct bullet trajectory analysis. Wong explained that soot comes out of the barrel when a firearm is discharged, as does gunshot residue. Hot, unburned powder kernels create "stippling," which will embed into clothing and skin and will occur within about eight inches of the end of the firearm. Wong did not believe appellant shot Lewis at point-blank range (as Nguyen testified) because if that were the case he would expect to find soot and stippling on Lewis's clothes and body. The autopsy report did not indicate that soot or stippling was found on Lewis's body, and Wong's examination of the T-shirt worn by Lewis disclosed no soot or stippling.

A neighbor, Ira Manning, testified that after the crash he saw two men walking away from the car who indicated their friend had been shot. They went around the corner and Manning lost sight of them. Another neighbor, Jose Huezo, saw the crash and saw two men walking down the street who told him they had called the police. The men then walked toward Falcon Street, returning later as police were arriving.

6

The prosecution's theory of the case was that the shooting was committed while appellant was attempting to rob Lewis of his drugs, and the crime was first degree felony murder. The defense theory at trial was that the shooting was at most voluntary manslaughter because Muir had a gun that he successfully hid from police after the crash and appellant took out his gun to defend himself. The trial court instructed the jury on first degree felony murder, second degree malice murder, voluntary manslaughter based on imperfect self-defense and self-defense as a justification for homicide. The jury returned a verdict of second degree murder and found the firearm allegation to be true.

DISCUSSION

I. *Sufficiency of the Evidence of Second Degree Murder*

Appellant argues the evidence at trial was insufficient to support his conviction for second degree murder. He contends there was no substantial evidence he acted with the necessary malice aforethought, and that the only two crimes supported by the evidence were first degree felony murder during the commission of an attempted robbery or voluntary manslaughter if the jury found the shot was fired with an honest belief in the need for self-defense. We disagree.

To evaluate a claim of insufficiency of the evidence, "we examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value— that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." (*People v. Lewis* (2001) 25 Cal.4th 610, 642.) We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

Second degree murder is the unlawful killing of a human being with malice aforethought, which can be either express or implied. (§§ 187, subd. (a), 188.) Express malice is the intent to unlawfully kill. (*People v. Perez* (2010) 50 Cal.4th 222, 233, fn. 7.) Malice is implied "when a killing results from an intentional act, the natural consequences of which are dangerous to human life, and the act is deliberately performed

7

with knowledge of the danger to, and with conscious disregard for, human life." (*People v. Cook* (2006) 39 Cal.4th 566, 596.)

Viewed in the light most favorable to the judgment, the evidence supported a finding that appellant pulled out a loaded gun during the course of a drug deal, stuck it inside the window of a car occupied by four people, demanded that they not drive away, and then fired a shot, striking Lewis in the back and killing him. Even if appellant did not intend to kill Lewis (and the evidence of a shot fired at close range was sufficient to support a finding that he did), his act of pointing a loaded gun inside a car full of people and pulling the trigger demonstrated a conscious disregard for human life. (See *In re Russell H.* (1987) 196 Cal.App.3d 916, 919-921 [substantial evidence of implied malice second degree murder when defendant pulled out gun during dispute over the price of drugs, cocked it, waved it around, and made threatening statements before it discharged].)

Appellant suggests the evidence compelled a finding that malice was negated by his belief in the need for self-defense. We are not persuaded. The evidence supporting appellant's claims of perfect and imperfect self-defense consisted primarily of his out-of-court statements to Detective Morris and his apology letter to Lewis's family, in which he indicated he pulled the gun because he believed Muir had a gun. But other evidence contradicted appellant's statements. Swafford testified appellant put his hand inside the car while holding a gun and told them, "Don't drive off," before pointing the gun at Lewis. Swafford, Muir and Nguyen maintained there was no gun in the car. The jury was not required to credit the evidence that appellant fired the gun while acting in self-defense or unreasonable self-defense if it rejected a felony-murder theory.

## II. *Propriety of Instruction on Second Degree Murder*

Appellant argues the trial court erred by instructing the jury on second degree murder over his objection because the amended information charged him with only felony murder, and second degree murder with malice is not a lesser included offense of felony murder. We conclude the instruction was proper.

A.  *Proceedings Below*

In his previous appeal, appellant argued his conviction for first degree felony murder should be reversed because the trial court had failed to instruct the jury on second degree murder and voluntary manslaughter as lesser included offenses.  This court agreed an instruction should have been given on voluntary manslaughter, determined the error was prejudicial, and found it unnecessary to address whether the court should have additionally instructed on second degree murder.  Rejecting the People's claim that no instruction was required because voluntary manslaughter is not a lesser included offense of felony murder, we noted that the sua sponte duty to instruct on lesser included offenses is to be determined by the accusatory pleading, and in this case, the original information charged appellant with murder with malice aforethought.  (See *People v. Anderson* (2006) 141 Cal.App.4th 430, 445 (*Anderson*) [second degree murder and voluntary manslaughter were lesser included offenses of murder as pleaded, even though the prosecution proceeded on felony-murder theory].)

After the case was remanded for retrial, in an apparent attempt to narrow the charged crime to felony murder, the district attorney filed an amended information alleging:  "On or about November 2, 2008, defendant DESHAUN PARISH MALONE did commit a felony namely:  MURDER, a violation of Section 187(a) of the Penal Code of the State of California, County of Solano, in that said defendant did unlawfully, and during the course of an inherently dangerous felony, murder KENDRICK LEWIS, a human being."  At the close of evidence, defense counsel filed a memorandum of points and authorities arguing that the jury could not be instructed on first degree felony murder because the amended information alleged only second degree felony murder.  (See *People v. Chun* (2009) 45 Cal.4th 1172, 1182 (*Chun*) [difference between first degree felony murder under § 189 and common law second degree felony murder].)  Alternatively, defense counsel argued that if first degree felony-murder instructions were given, the court should instruct the jury on manslaughter and self-defense, but not on second degree murder.  The prosecutor responded that the amended information gave notice of first degree felony murder and argued the jury should be instructed on that

9

offense as well as second degree murder with malice aforethought and voluntary manslaughter.

The trial court instructed the jury on first degree felony murder, second degree murder with express or implied malice, voluntary manslaughter under a theory of imperfect self-defense, and self-defense as a justification for homicide. It declined to resolve whether second degree murder and voluntary manslaughter were lesser included offenses of felony murder: "[F]rom a 10,000 foot view, when the People elect the felony murder and put all the eggs in that basket and the defense presents some pretty significant evidence . . . , I think there is substantial evidence to support an imperfect self-defense theory. And it would create a . . . miscarriage of justice to not provide instructions, despite the fact it's unresolved, whether these are lesser includeds. [¶] In order to reach the defense theory we have to present an alternative theory of murder to the jury, and that would have to be second degree implied malice murder. [S]o it is my intent to in the alternative provide [second degree murder] as a lesser included or alternative theory of liability based on the defense's request that this defense theory be instructed before the jury."

Based on these instructions, the jury returned a verdict of second degree murder that, as we explained above, was supported by substantial evidence.

B. *Analysis*

A criminal defendant must be given fair notice of the charges against him in order that he may have a reasonable opportunity to prepare a defense and avoid unfair surprise at trial. (*People v. Shoaff* (1993) 16 Cal.App.4th 1112, 1117.) When an offense is charged in the accusatory pleading, the defendant is placed on notice that he may be convicted of that offense or any lesser offense necessarily included within the charged crime. (§ 1159; *People v. Reed* (2006) 38 Cal.4th 1224, 1227.) A defendant may consent to have the trier of fact consider a nonincluded offense, but absent such consent, he may not be convicted of a crime that is neither charged in the accusatory pleading nor necessarily included within a charged crime. (*People v. Birks* (1998) 19 Cal.4th 108,

10

117, 127-128 (*Birks*); *People v. Lohbauer* (1981) 29 Cal.3d 364, 367-368; *People v. Solis* (2015) 232 Cal.App.4th 1108, 1120.)[2]

Appellant's argument focuses on whether second degree malice murder is a lesser included offense of felony murder, an issue the California Supreme Court has yet to decide. (*People v. Taylor* (2010) 48 Cal.4th 574, 623; *People v. Valdez* (2004) 32 Cal.4th 73, 114, fn. 17.) Appellant contends—contrary to his position in the previous appeal— that second degree murder is *not* an included offense of first degree felony murder and that consequently, his objection to a second degree murder instruction should have carried the day at trial. (See *People v. Castaneda* (2011) 51 Cal.4th 1292, 1328-1329 [rejecting claim that instruction on second degree murder as lesser included offense was required and noting "defendant does not address . . . how second degree murder, which requires malice, can be a lesser included offense of first degree felony murder, which does not require malice"].)

Regardless of its characterization as a lesser included offense, the amended information charging appellant with murder under section 187, subdivision (a) provided him with sufficient notice he could be convicted of second degree murder with malice. "Malice murder and felony murder are two forms of the single statutory offense of murder. Thus, a charge of murder not specifying the degree is sufficient to charge murder in any degree. The information also need not specify the theory of murder on which the prosecution relies at trial." (*People v. Contreras* (2013) 58 Cal.4th 123, 147; see *People v. Jones* (2013) 57 Cal.4th 899, 968 [information charging defendant with murder "in violation of PENAL CODE SECTION 187(a)" provided notice of first degree felony murder under § 189]; *People v. Moore* (2011) 51 Cal.4th 386, 412-413 [felony murder and premeditated murder with malice are not distinct crimes and need not be

---

[2] "The definition of a lesser necessarily included offense is technical and relatively clear. Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*Birks*, *supra*, 19 Cal.4th at p. 117.)

11

separately pleaded]; *People v. Nakahara* (2003) 30 Cal.4th 705, 712 [same].) If an information specifically charging malice murder provides a defendant with adequate notice of a felony-murder theory, we think the converse must be true.

Appellant suggests he was not given notice that the case would be submitted on an implied malice theory because the prosecutor elected to charge him with a murder committed "during the course of an inherently dangerous felony." As the Attorney General notes (and as argued by the defense below in urging the court that the jury should not be instructed on first degree felony murder), this language is more evocative of the common law doctrine of second degree felony murder, namely, " 'an unlawful killing in the course of the commission of a felony that is inherently dangerous to human life but is not included among the felonies [supporting first degree felony murder] enumerated in section 189.' " (*Chun*, *supra*, 45 Cal.4th at p. 1182.) The second degree felony-murder rule "simply describes a different form of malice under section 188" by " 'imput[ing] the requisite malice for a murder conviction to those who commit a homicide during the perpetration of a felony inherently dangerous to human life.' " (*Id.* at p. 1184) Accordingly, the literal language in the amended information was sufficient to alert appellant the case could be submitted to the jury on an implied malice theory.

Even if we assume the prosecution successfully elected to proceed only on a first degree felony-murder theory and that as a consequence, second degree murder was neither charged nor necessarily included within the charge, we would find no error. Appellant requested an instruction on voluntary manslaughter based on imperfect self-defense. Voluntary manslaughter requires proof that the defendant killed intentionally or with a conscious disregard for human life. (*People v. Bryant* (2013) 56 Cal.4th 959, 968-969 (*Bryant*); *People v. Blakeley* (2000) 23 Cal.4th 82, 88-89; *People v. Rios* (2000) 23 Cal.4th 450, 461-469 (*Rios*); CALCRIM No. 572.) This is a mental state equivalent to second degree murder with malice aforethought, with the caveat that in a case in which murder is charged, the mitigating circumstances of imperfect self-defense or provocation will negate malice and render a homicide that would otherwise be murder voluntary manslaughter. (*Bryant*, at p. 969; *Rios*, at p. 461.) By requesting an instruction on a

12

lesser offense that included the elements of implied malice murder (absent the mitigating circumstance of imperfect self-defense or provocation), appellant implicitly consented to the jury's consideration of that issue and forfeited his right to complain about the second degree murder instruction on appeal. (See *People v. Le* (1995) 39 Cal.App.4th 1518, 1521-1522 [defendant who requested instruction on simple assault as lesser related offense of charged robbery could not complain that court gave instruction on lesser related offense of aggravated assault, the crime of which defendant was convicted, even though he objected to the aggravated assault instruction].)

### III.  Trombetta *Motion*

Lewis's car, a 2007 Chevrolet Impala, was taken into police custody after the shooting.  On July 7, 2010, two weeks after the verdict in the first trial but before the period for filing an appeal had expired, the prosecution released the car to Lewis's family because the family was continuing to service the car loan and wanted it back.  After the case was remanded for retrial following the first appeal, the defense filed a motion under *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*), seeking dismissal of the charges based on the prosecution's failure to preserve this allegedly exculpatory evidence.  The trial court denied the motion, concluding the vehicle itself was not material and the police did not act in bad faith.  Appellant argues this ruling was erroneous and the charges should have been dismissed.  We reject the claim.

### A.  *Proceedings Below*

Kenton Wong was retained by the defense as an expert in forensic science.  At a hearing on the *Trombetta* motion, he testified that he had reviewed the crime scene photographs, law enforcement reports, witness statements and preliminary hearing testimony in the case, and understood the defense was one of accidental discharge of the gun.  He believed he needed to examine the vehicle in which the victim was shot to determine whether the physical evidence supported the defense theory of the case.  Wong acknowledged the crime scene photographs were useful, but they did not reflect whether a bullet hole had been found in the back of the driver's seat, nor did they show soot,

stippling or gunshot residue, which would help to determine the distance of the gun relative to the victim. Wong acknowledged the forensic evidence would not tell him whether appellant fired the gun in self-defense. Detective Trojanowski and identification technician Tara Fahey testified that there were no bullet holes in the back of the driver's seat, only blood on the seat itself.

The court denied the defense motion to dismiss, reasoning as follows: "I am not convinced that the car itself presents any significant material information. The evidence is pretty clear that there isn't a bullet hole that appears in the back, and certainly, there was clearly no evidence that any bullet hole goes through the front. [¶] But let's say there was a bullet hole. It doesn't necessarily reflect on the defense's theory of the case. The trajectory, if it was an intentional shot, he could just be a really bad shot. If it was an accidental shot, it could be a[n] accidental shot." The court noted Wong had not tested the clothing that was still booked in evidence for soot or stippling, and that part of the car seat cover was still available for testing. Additionally, a 2007 Impala was not a rare car, and measurements could be taken from another vehicle of the same make and model using the crime scene photographs. The court noted it was "a little bit unusual" that the car had been released without a court order, but it found no evidence of bad faith by the prosecutor or police. There had been "plenty of time" during the first trial for the defense to examine the car.

At trial, the court held a hearing under Evidence Code section 402 to determine the parameters of Wong's trial testimony. Wong reiterated that it would have been helpful to examine the car in which the shooting occurred because gunshot residue, soot and stippling could have helped determine the angle and range at which the gun was fired, though he acknowledged the evidence would not have indicated whether appellant's arm was bumped before he fired the shot. The court ruled that evidence regarding Wong's inability to examine gunshot residue within the car was more prejudicial than probative under Evidence Code section 352 because it would create a "trial within a trial" and would shed no light as to whether appellant's hand was bumped by the car frame as he claimed or whether he pointed the gun at Lewis and fired

14

intentionally.  (Evid. Code, § 352.)  The court noted that the T-shirt worn by Lewis at the time of the shooting was still in police custody.  As indicated *ante*, in the Facts and Procedural History, Wong testified before the jury that in his opinion, the available evidence was consistent with appellant's report that he shot Lewis after the window frame hit his arm and was inconsistent with Lewis being shot at point-blank range.

B.  *Analysis*

" 'Due process does not impose upon law enforcement 'an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution.' [Citations.]  At most, the state's obligation to preserve evidence extends to 'evidence that might be expected to play a significant role in the suspect's defense.' [Citations.]  If the evidence's exculpatory value is apparent and no comparable evidence is reasonably available, due process precludes the state from destroying it. [Citations.]  If, however, 'no more can be said [of the evidence] than that it *could have* been subjected to tests, the results of which *might have* exonerated the defendant' [citation], the proscriptions of the federal Constitution are narrower; 'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.' " (*People v. Duff* (2014) 58 Cal.4th 527, 549 (*Duff*) [dismissal not required because defendant did not establish that car in which shooting occurred had exculpatory value that would have been apparent to police and did not make showing of bad faith]; see *Trombetta*, *supra*, 467 U.S. at p. 488 and *Arizona v. Youngblood* (1988) 488 U.S. 51, 57-58.)  On appeal, "we must determine whether, viewing the evidence in the light most favorable to the superior court's finding, there was substantial evidence to support its ruling." (*People v. Roybal* (1998) 19 Cal.4th 481, 510 (*Roybal*).)

Here, as in *Duff*, substantial evidence supports the trial court's finding that Lewis's car had no apparent exculpatory value at the time it was released to Lewis's family.  It was undisputed that Lewis was killed by a single bullet fired by appellant inside the car.  Appellant's defense was that he had taken out his gun to shoot one of the passengers in

15

the backseat who had reached for a gun, but that appellant's gun fired accidentally when the frame of the car hit his arm. Wong was able to testify, without contradiction, that the evidence did not support a firing of the gun at point-blank range. By Wong's own admission, an examination of the car for gunshot residue, soot or stippling would not have further supported appellant's theory of the case by indicating whether appellant drew his gun in self-defense, or whether he fired the shot accidentally when his arm was hit. The most that can be said is that an examination of the car itself *might* have provided evidence favorable to appellant; consequently, dismissal or other sanctions were not required absent a showing of bad faith on the part of the police or the prosecution.

Substantial evidence also supports the trial court's conclusion the police and the prosecution did not act in bad faith. (*Roybal*, *supra*, 19 Cal.4th at p. 510.) An entire trial was held during which time the defense did not perform tests or measurements on the car, and it was not until the case was remanded for retrial that a request to examine the car was made. The car was released after the first trial to accommodate the financial circumstances of a murder victim's family, not to deprive the defense of exculpatory evidence. Photographs of the car on the night of the shooting were available for examination, and the technician who processed the car testified and was available for cross-examination. It was clear from the evidence that no bullet hole was found in the backseat of the car, a circumstance the defense expert was able to address when he testified before the jury. Absent any indicia of bad faith, the court properly denied appellant's *Trombetta* motion.

IV. *Mistrial; Double Jeopardy*

Appellant argues the trial court violated his double jeopardy rights under the state and federal constitutions by allowing a retrial of the murder charge after the prosecution induced a mistrial by referring to appellant's prior murder conviction. (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15.) We disagree.

16

A. *Proceedings Below*

During the first retrial of this case, which began September 18, 2013, the court ruled that no reference could be made to appellant's first trial and conviction of first degree murder in connection with (1) the release of Lewis's car to his family after the first trial was complete; and (2) Kelly's questioning as a prosecution witness. Similarly, no reference to Kelly's conviction of first degree murder was to be made. The prosecution called as witnesses Detective Trojanowski and Officer Tony DeTomasi, who investigated the shooting; Rigoberto Estrada, who lived on the street and heard the gunshot; and Tara Fahey, the evidence technician who responded to the scene and processed Lewis's car when it was taken into police custody.

On recross-examination, defense counsel asked Fahey whether the car was still available for processing and Fahey indicated it had been released and was no longer in the police department's possession. On redirect examination, following an unreported bench conference after which the prosecutor stated, "The door has been opened," the prosecutor asked Fahey whether the car was released after appellant was convicted of first degree murder and Fahey responded yes. Defense counsel objected and the court held a reported bench conference with counsel in which it indicated it was "absolutely flabbergasted" the prosecutor had asked this question without discussing it first. The prosecutor took the position that defense counsel had opened the door to the information by suggesting it had been improper for the police to release the car, and it was important to explain why that car had been released. Defense counsel moved for a mistrial. Following a recess, the court addressed the mistrial motion and asked defense counsel, "[Y]our client understands that in moving for a mistrial, there would not be a double jeopardy aspect. He is aware in making that motion?" Defense counsel responded yes and the court granted the mistrial, observing there was no instruction that could "unring this bell."

The second retrial began on September 23, 2013, at which time defense counsel advised the court she was considering a motion to dismiss for prosecutorial misconduct, based on the theory that jeopardy had attached during the previous trial and double

17

jeopardy principles would be violated by proceeding after that mistrial. The court reminded counsel that she had acknowledged jeopardy did not attach and indicated it "would not have gone forward in the manner that I did had I known you were going to object based on prosecutorial misconduct."

The court formally heard defense counsel's motion to dismiss based on double jeopardy on October 2, 2013, at which time defense counsel cited the federal Constitution and argued the prosecutor had been attempting to "goad the defendant into moving for a mistrial" because Jamal Kelly had refused to testify and witnesses Estrada and Trojanowski had been impeached. Defense counsel also suggested the prosecution's case was not going well because its lead investigator was unavailable to sit through the entire trial and the prosecutor was "annoyed" by the defense raising issues regarding the release of Lewis's car. The prosecutor denied this characterization of the proceedings, noting (1) Kelly had not yet been called as a witness and it had always been anticipated he might refuse to answer questions; (2) she believed Trojanowski and Estrada had done well as witnesses; (3) she was unconcerned about her lead investigator being unavailable and could have made other arrangements if she had been concerned; (4) she was not annoyed by appellant's *Trombetta* motion or issues regarding the release of the car; and (5) she had nothing to gain from a mistrial, as she had been caring for her elderly mother, who was suffering from dementia, and the longer the case went on the more difficult it was for her personally. The prosecutor attributed her question about the prior trial and verdict to the stress and fatigue caused by caring for her mother, who had a "major meltdown" on the day of the mistrial, requiring several telephone calls. The court denied the motion to dismiss.

B. *Analysis*

The double jeopardy clauses of the federal and state constitutions protect criminal defendants from repeated prosecutions for the same offense. (*People v. Batts* (2003) 30

Cal.4th 660, 678, 685 (*Batts*); U.S. Const., 5th Amend.; Cal. Const., art. I, § 15.)[3] When a defendant moves for a mistrial, "the general rule is that the defendant's request . . . constitutes consent that waives any double jeopardy claim, and hence there is no bar to retrial." (*Batts,* at pp. 679-680.) "[T]he normal and usually sufficient remedy for the vast majority of instances of prejudicial prosecutorial misconduct that occur at trial is provided under the federal and state due process clauses, and calls for either a declaration of mistrial followed by retrial, or a reversal of a defendant's conviction on appeal followed by retrial." (*Id.* at p. 666, italics omitted.)

Under the federal double jeopardy clause, retrial is prohibited following the grant of a defendant's mistrial motion only if the prosecution committed the misconduct with the intent to provoke a mistrial. (*Oregon v. Kennedy* (1982) 456 U.S. 667, 679 (*Kennedy*); *Batts*, *supra*, 30 Cal.4th at pp. 665, 682.) The California Constitution bars retrial in an additional circumstance: "when the prosecution, believing (in view of events that occurred during trial) that a defendant is likely to secure an acquittal at that trial, knowingly and intentionally commits misconduct in order to thwart such an acquittal." (*Batts*, at p. 666.) In that circumstance, "retrial is barred under the state double jeopardy clause only if a court, reviewing all of the circumstances as of the time of the misconduct, finds not only that the prosecution believed that an acquittal was likely and committed misconduct for the purpose of thwarting such an acquittal, but also determines, from an objective perspective, that the prosecutorial misconduct deprived the defendant of a reasonable prospect of an acquittal." (*Ibid*.)

In this case, the trial court's order denying appellant's motion to dismiss on double jeopardy grounds was based on the finding the prosecutor was not attempting to goad the defense into moving for a mistrial. "When the double jeopardy question requires the trial court to resolve disputed facts, the appellate court reviews the case under the substantial

---

[3] The Fifth Amendment of the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." Article I, section 15 of the California Constitution provides that "[p]ersons may not twice be put in jeopardy for the same offense."

19

evidence standard.  [Citation.]"  (*People v. Davis* (2011) 202 Cal.App.4th 429, 438.)  In reviewing a ruling denying a motion to dismiss on double jeopardy grounds, "it is to be expected that appellate judges 'will not inexorably reach the same conclusion on a cold record at the appellate stage that they might if any one of them had been sitting [on the matter] as a trial judge,' and that 'appellate judges [should] defer to the judgment of trial judges who are "on the scene" in this area.' "  (*Batts*, *supra*, 30 Cal.4th at pp. 682-683, citing *Kennedy*, *supra*, 456 U.S. at p. 676, fn. 7.)

Assuming defense counsel did not forfeit the issue by her initial agreement that jeopardy would not attach if she moved for a mistrial, the trial court did not err in denying her subsequent motion for dismissal.  Though the prosecutor's question about appellant's first murder conviction showed poor judgment in light of the court's prior rulings, her explanation about believing the defense had opened the door was not implausible and the trial court was in the best position to assess her motivations.  In light of the family situation she disclosed, a mistrial would have worked to the prosecutor's disadvantage, supporting the trial court's determination that this was not her intention.  Substantial evidence supports the trial court's finding the prosecutor did not intend to cause a mistrial, and reversal is not required under the double jeopardy clause of the federal Constitution.

Nor are we persuaded that appellant was entitled to dismissal under the double jeopardy clause of the California Constitution, on the ground that acquittal was likely and the prosecutor asked the question about the first conviction in order to prevent that acquittal.[4]  Contrary to appellant's characterization of the record, the first retrial was not going badly for the prosecutor.  Only four witnesses had been called at that point, and none of them provided unexpected exculpatory evidence that made an acquittal likely.  The prosecutor understood that appellant's cohort Jamal Kelly would probably refuse to

---

[4]  Although defense counsel did not specifically rely on the California Constitution in making the motion to dismiss, we address the claim on its merits to forestall appellant's claim that counsel was ineffective.  (See *People v. Reyes* (2008) 165 Cal.App.4th 426, 434.)

testify if called to the stand, but appellant had been convicted of first degree felony murder in his first trial without Kelly's testimony. Viewing the evidence from an objective perspective, any misconduct committed by the prosecutor cannot be said to have deprived appellant of a reasonable prospect of an acquittal. (*Batts*, *supra*, 30 Cal.4th at p. 666.) And, because the evidence would not support a finding that an acquittal was objectively likely at that point in time, we decline appellant's request that we remand the case for a hearing on whether the prosecutor subjectively believed an acquittal was likely and acted to avoid that result.

## V. *Direct Examination of Accomplice Jamal Kelly*

The prosecutor called Jamal Kelly as a witness and questioned him about whether he and appellant intended to commit a robbery. Kelly refused to answer and was held in contempt of court. Appellant argues the trial court should have granted his motion for mistrial or motion for new trial on that ground, because the prosecutor's questions amounted to highly prejudicial testimony and cross-examination was not possible. We disagree.

### A. *Proceedings Below*

Kelly was interviewed by police and told them that on the way to buy the drugs from Lewis, appellant said he was going to commit a robbery. Kelly was separately tried and, based in part on his trial testimony to the same effect, was convicted of first degree felony murder. The Court of Appeal affirmed that judgment in a decision issued September 4, 2012, and review was denied by the state Supreme Court on December 19, 2012, before the retrial commenced in appellant's case. (*People v. Jamal Kelly* (Sept. 4, 2012, A129688) [nonpub. opn.].)

As an extrajudicial statement of a codefendant, Kelly's statement to police about the plan to commit a robbery was inadmissible unless Kelly testified and was available for cross-examination. (See *Bruton v. United States* (1968) 391 U.S. 123, 126-127; *People v. Aranda* (1965) 63 Cal.2d 518, 530-531.) The prosecutor indicated she wished to call Kelly as a witness, and Kelly was ordered to appear and was examined outside the

presence of the jury. Although the court and the parties agreed that Kelly could not refuse to testify on Fifth Amendment grounds given that his conviction was final (see *People v. Lopez* (1999) 71 Cal.App.4th 1550, 1554), Kelly repeatedly stated "no comment" to the prosecutor's questions about the shooting.

At trial, the prosecution called Kelly as a witness, apparently anticipating he would not answer questions. The following exchange occurred: "Q: Mr. Kelly, were you present with Mr. Malone on the night of November 2, 2008 when he shot and killed Kendrick Lewis? [¶] A: No comment. [¶] . . . [¶] [Q]: Did you witness the shooting of Kendrick Lewis? A: No comment. Q: Did you tell the police that you saw Mr. Malone shoot Mr. Lewis? A: No comment. Q: Did you tell the police that you were there with Mr. Malone to rob Mr. Lewis? A: No comment." The trial court directed Kelly to answer the questions. The prosecutor continued, "Did you tell the police you were there with Mr. Malone to rob Mr. Lewis?" to which Kelly again responded, "No comment." Defense counsel objected and the court struck the two previous questions by the prosecutor. The exchanged continued: "Q: Did you witness the events that occurred— A: No comment. Q: Did you talk to the police about the events that occurred November 2, 2008? A: No comment." The court advised Kelly that the failure to follow an order to answer questions was contempt of court and the prosecutor asked, "Are you going to answer any questions about November 2, 2008?" Kelly again responded, "No comment," and the court found him in contempt.

During a discussion outside the presence of the jury, defense counsel argued that the prosecutor's questions were "highly inappropriate" because the jury could infer that appellant and Lewis had planned a robbery and Lewis was not available for cross-examination on that point. The court offered to allow defense counsel to cross-examine Kelly, but counsel declined, noting there was "nothing to cross-examine him [about]." The court agreed with the prosecutor that questions were not evidence, and noted it was anticipated appellant would testify, and if he indicated he had not planned a robbery with

22

Kelly, Kelly's prior statements to that effect would not be admissible to impeach appellant due to confrontation clause issues.[5]

Immediately thereafter, the court admonished the jurors they were not to consider the effect of the court holding Kelly in contempt and advised them: "[Q]uestions are not evidence. Only the witness's answers are evidence. Questions presented by any of the attorneys that suggest any facts or suggest any information are just questions. Only the witness's answers are evidence. The questions are only helpful to the extent they assist you to understand the witness's answers." This admonishment was echoed in CALCRIM No. 104, given at the end of the case.

The following day, Detective Morris recounted his interview of appellant and erroneously stated that appellant had said he had intended to rob the victim of drugs and was going to pull out a gun when given a sign by Kelly. Morris corrected this testimony on cross-examination, noting he may have confused the statements with another witness and appellant did not in fact make that statement. After Morris had testified, defense counsel indicated she was "a little uncomfortable" with the possible inference that Morris had confused appellant's interview with Kelly's, and would infer that in fact Kelly had made the statement about the robbery. The court indicated it believed the problem had been cured through cross-examination, but offered to allow defense counsel to ask follow-up questions about the number of interviews Morris had done during the course of his career. Morris was recalled to the stand and testified he had reviewed the transcript of his interview with appellant and had been mistaken when he said appellant had admitted committing a robbery. He had interviewed appellant five years previous to the trial, in 2008, and had conducted interviews of hundreds of other suspects since that time, possibly leading to his confusion.

Defense counsel ultimately requested a mistrial based on the prosecutor's questioning of Kelly and Detective Morris's testimony about his mistaken belief appellant had admitted intending to commit a robbery. Counsel argues that the

---

[5] Appellant did not testify during the retrial from which this appeal is taken, even though he testified at the first trial.

examination of these two witnesses, taken together, would improperly suggest to the jury that Kelly had told the police appellant planned a robbery—evidence that was clearly inadmissible in appellant's trial. Defense counsel raised the issue again in a motion for new trial which characterized the prosecutor's examination of Kelly as prosecutorial misconduct. (See § 1181, subd. 5.) The trial court denied the motion.

B. *Analysis*

We begin our discussion of the issue by noting that it was appropriate for the prosecutor to call Kelly as a witness, even though it was relatively certain Kelly would refuse to answer questions. "[A] prosecutor is not required to accept at face value every asserted claim of privilege, and he may compel a witness to claim the privilege against self-incrimination on a question-by-question basis." (*People v. Shipe* (1975) 49 Cal.App.3d 343, 349 (*Shipe*).) However, a prosecutor "may not, under the guise of cross-examination, get before the jury what is tantamount to devastating direct testimony." (*Ibid.*; see *Douglas v. Alabama* (1965) 380 U.S. 415, 420 (*Douglas*.) "Under the confrontation clause of the Sixth Amendment, a defendant has the right to confront and cross-examine witnesses presented against him. [Citation.] A defendant's confrontation rights may be violated where a prosecutor examines a recalcitrant witness and poses questions that relate to prior statements made by that witness, in circumstances where the witness's recalcitrance effectively prevents cross-examination concerning those prior statements. [Citations.]" (*People v. Morgain* (2009) 177 Cal.App.4th 454, 463 (*Morgain*).)

Appellant argues the prosecutor should not have been permitted to ask Kelly whether he had previously told police that he and appellant intended to commit a robbery. He relies on the decisions in *Shipe* and *Douglas*, which are distinguishable. In both cases, a witness made a statement to law enforcement regarding the defendant's involvement in the crime and then refused to testify at trial. (*Douglas*, *supra*, 380 U.S. at pp. 416-417; *Shipe*, *supra*, 49 Cal.App.3d at pp. 345-346.) The prosecutors proceeded to ask several leading questions detailing the facts of the alleged crime, prefaced by "Is it

24

not true that . . . ?  (*Shipe,* at pp. 346-349) or followed by "Did you make that statement?" (*Douglas*, at pp. 416-417).  In neither case were the questions stricken or the jury admonished that the questions were not evidence.  (*Morgain*, *supra*, 177 Cal.App.4th at p. 465 [rejecting similar challenge and distinguishing *Douglas* and *Shipe*].)

The prosecutor's initial questions to Kelly—whether he was present at the scene of the shooting, whether he saw the shooting, and whether appellant was the shooter—could not have prejudiced appellant's case in any way because they referred to facts that were not disputed by the defense.  The two questions regarding whether Kelly had told police that he and appellant were going to rob Lewis were stricken and the jury was advised it could not consider them as evidence.  We presume the jury followed that instruction, and that consequently, the jury did not treat the prosecutor's questions as the equivalent of testimony by Kelly.  (*Morgain*, *supra*, 177 Cal.App.4th at p. 465.)

This is not a case, like *People v. Murillo* (2014) 231 Cal.App.4th 448, 455-457 (*Murillo*), in which "the prosecutor's leading questions are tantamount to evidence and overpower the proceedings so that the resulting prejudice is incurable by admonition or instruction.  [Citation.]"  In *Murillo*, a witness who identified the defendant before trial in a photographic lineup refused to answer questions at trial.  His identification to police was the only eyewitness identification of the defendant.  The trial court allowed the prosecution to ask the witness 110 leading questions concerning the details of his out-of-court statement and identification, and in response to each question, the witness said he had " 'nothing to say' " or did not respond.  (*Id.* at pp. 450-451.)  The trial court allowed the prosecutor to display the photographic lineup on which the witness had circled defendant's photo, along with other photos of the witness himself, and the witness refused to answer any questions about these exhibits.  In the present case, the alleged inability to confront Lewis arises from two questions (in reality, from a single question twice repeated) and any improper inference was cured by the court's admonition.

Nor does the testimony of Detective Morris change the equation.  Morris initially testified that when interviewed, appellant acknowledged he intended to rob Lewis.  But it became abundantly clear through cross-examination that Morris was simply mistaken on

25

this point, most likely because a number of years had passed and he had interviewed hundreds of subjects since appellant. There is no danger the jury improperly construed Morris's testimony to mean that either appellant or Kelly admitted a robbery was intended.

"A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court ruling denying a mistrial. [Citation.]" (*People v. Bolden* (2002) 29 Cal.4th 515, 555.) There was no abuse of discretion here because the prosecutor's examination of Kelly and Detective Morris did not deprive appellant of his right to a fair trial. Similarly, the court did not abuse its discretion in denying the motion for new trial on the same ground. (See *People v. Lightsey* (2012) 54 Cal.4th 668, 729 [applying abuse-of-discretion standard to motion for new trial based on prosecutorial misconduct].)

Finally, we would conclude any error or misconduct on the grounds alleged by appellant were harmless beyond a reasonable doubt under the standard for reviewing federal constitutional error. (*Shipe*, *supra*, 49 Cal.App.3d at p. 355, citing *Chapman v. California* (1967) 386 U.S. 18, 23-24.) The questions asked of Kelly and the "corrected" testimony of Detective Morris concerned appellant's intent to commit a robbery, as was necessary for a conviction of first degree felony murder under the prosecution's theory of the case. The jury acquitted appellant of first degree felony murder, demonstrating it did not draw the improper inferences with which defense counsel was concerned.

## VI. *Cumulative Error*

Appellant argues the errors he has alleged were cumulatively prejudicial and require reversal, even if they were individually harmless. We disagree. We have assumed error for purposes of analysis with respect to one of the five issues raised by appellant and have found no error in connection with the others. There is no error to cumulate. (*People v. Thornton* (2007) 41 Cal.4th 391, 453.)

DISPOSITION

The judgment is affirmed.

_____
NEEDHAM, J.

We concur.

_____
JONES, P.J.

_____
BRUINIERS, J.